GRIFFIN, J.
We find no error in appellant, George L. Crossley, Jr.’s [“Crossley”], conviction of solicitation to commit first-degree premeditated murder and solicitation to commit assault. Nor do we find error in the inclusion of eighteen points for use of a firearm in calculating the sentence.
The- record reflects that when Mr. Crossley met with the confidential informant posing as a hired assassin, he had two firearms with him in a box. The following is the discussion between Mr. Crossley and the putative assassin concerning the firearms.
CROSSLEY: ... I think that’s better, that’s even better, and I’m, like I said, I’m an amateur. But I think that’s even better for you. Why leave him around where he can be found? And, and, you know, and if you, if you want to, uh, take the, uh, uh, nine millimeter, I mean you can do it any way you want — you obviously know how you want to do it. But, uh, ....
MARTIN: Do you want me to use the nine?
CROSSLEY: No. You, you, well, yeah, I would, actually, I was going to make that, uh, um, a, uh, a payment toward the, toward the job. But I, I was going to give you the nine, you know, that’s, I had the guy down at the, what was it, that Shoot Straight Gun Shop, who wanted it off me in the worst way the last time I took it down and, uh, and fired it on the range. Um, because, uh, the way things are right now, with those kind and things, *1210 you, they’re just not available any more, you know.
MARTIN: Yeah, they’re, they’re, they’re worth some money — they are. That’s, they’re hard to come by these days.
CROSSLEY: Yes, and, uh, ...
MARTIN: Especially ones that are clean.
CROSSLEY: ... and I have taken very good care of this. And what’s nice about it is not only is it clean, it hasn’t been used for anything, but it’s not even registered. So I’ve been told by those that I know, that that makes it worth even more, you know, uh, than the six-fifty I was originally offered for it. Uh, and so....
MARTIN: What, what’s the other gun you got?
CROSSLEY: Well, I got a .22 and that’s also unregistered. And that’s from, um, and that is from, uh, the Philippines. And, and those guys love that gun, too. They’ve, uh, they tell me that a high impact .22 shell can do a tremendous amount of damage, ...
MARTIN: Yeah, it can.
CROSSLEY: ... as well. And that is a very good firearm.
MARTIN: [...] like a nice gun.
CROSSLEY: I mean, it’s, uh, uh, and it is, it is a, uh, nice-shot, ten-shot semiautomatic. And it’s like a, it looks a little like a, an M-, M-16, but it’s, but it’s a, it’s a .22. And, um, in fact, neither is that registered. That was just given to me as a gift, as a matter of fact. And so neither one of my firearms, at this point, are registered. I have a thing about the government, uh, it shouldn’t be in that particular area. And so ...
MARTIN: And if you register it, you’ll lose it some day, uh, ...
CROSSLEY: Well, ....
MARTIN: ... plain and simple.
CROSSLEY: And the way I see it, um, whether I own a firearm or not, it’s not Uncle Sam’s business.
MARTIN: Right.
CROSSLEY: So, sooner or later, the way things have been going, the rest of us may end up in a knockdown-drag out with Uncle Sam anyway, ...
MARTIN: Exactly, right.
CROSSLEY: ... you know.
MARTIN: You got it. You got it.
CROSSLEY: I’ve seen enough, I’ve seen enough with, uh, um, um, with the Waco situation to realize that, that there are ex-, there are extremes. And, uh, and at that time, it was Uncle Sam that acted to the extreme.
MARTIN: Yeah, you can get away with murder by the government now. Uh, you got, you got this Ingram with you tonight? Did you bring it?
CROSSLEY: Yes, I do.
MARTIN: Yeah?
CROSSLEY: Yes, I did. I, that’s the one thing I thought of. I even brought a box of shells.
MARTIN: How much was, uh, Shoot Straight going to give you for it?
CROSSLEY: They were going to give me six-fifty. Uh, but they didn’t know it was unregistered. Um, and it, it shoots beautifully, I mean, it just, I’ve only, I think I’ve fired it like, uh, four times. And, um, uh, it, uh, and I’ve cleaned the sucker every time. But it’s, it’s a, just, it just, it just handles perfectly, and like an Ingram, you know. I was told there’s one little thing you can do in there and, and make it fully automatic, but, hey, a semi-automatic is fine with me.
MARTIN: It’ll work.
CROSSLEY: I mean, how many, how many forty shots can you get off at somebody and, you know, and like....
MARTIN: [...] bullet’s one.
*1211 CROSSLEY: Yeah, plus a nine millimeter does, it gives a nice, a nice sized little shell, there’s no question about that. Well, anyway, needless to say, I, uh, really appreciate Bill bringing you to my attention.
MARTIN: Oh, really?
CROSSLEY: I have a, uh, I don’t know, and if you do disappear and you ever come back my way — if you ever need anything, or if you’d like to fly somewhere — I do that, too.
Although this evidence is somewhat equivocal as to whether Mr. Crossley was merely using the two unregistered handguns as the inducement for the putative assassin to commit murder or whether he was offering to supply the weapon for the murder, it does not matter because either would constitute possession of a firearm during the commission of a crime for purposes of scoring points for sentencing. Fla.R.Crim.P. 3.703(d)(19). The fact that the jury did not make the “firearm possession” finding does not affect the court’s ability to score points for sentence calculation purposes. See Bradford v. State, 722 So.2d 858, 860 (Fla. 1st DCA 1998); see also McCloud v. State, 24 Fla.L. Weekly D153, 741 So.2d 512 (Fla. 5th DCA 1999).
The state correctly urges on cross-appeal that the sentence imposed represents a downward departure without written reasons. Because it is evident from the record, however, that the court believed it had imposed a guidelines sentence, it is appropriate to remand for re-sentencing. On remand, the trial court may impose a downward departure sentence if such a sentence is supported by valid written reasons. Carter v. State, 664 So.2d 62 (Fla. 5th DCA 1995).
Judgment AFFIRMED; sentence VACATED; and REMANDED.
DAUKSCH and COBB, JJ., concur.