901 So.2d 837 (2005)
James Michael HUGHES, Petitioner,
v.
STATE of Florida, Respondent.
No. SC02-2247.
Supreme Court of Florida.
April 28, 2005.
*838 Nancy A. Daniels, Public Defender and P. Douglas Brinkmeyer, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Petitioner.
Charles J. Crist, Jr., Attorney General, James W. Rogers, Bureau Chief, Criminal Appeals and Trisha Meggs Pate, Assistant Attorney General, Tallahassee, FL, for Respondent.
CANTERO, J.
In this case, we consider whether a decision of the United States Supreme Court applies to defendants whose convictions already were final when that case was decided. In Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In Hughes v. State, 826 So.2d 1070 (Fla. 1st DCA 2002), the district court certified as a question of great public importance whether the rule announced in Apprendi applies retroactively.[1] We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. As explained below, we hold that Apprendi does not apply retroactively.

I. FACTS
Sections 921.001(5) and 921.0014(2), Florida Statutes (1997), (part of the 1994 sentencing guidelines) require that, when the recommended sentence computed on the sentencing scoresheet exceeds the maximum sentence provided in section 775.082, Florida Statutes (1997), the guidelines sentence must be imposed.[2] In this case, a jury convicted the petitioner of battery by a jail detainee on a jail detainee. The crime constituted a third-degree felony, for which the maximum sentence under section 775.082 is 60 months' imprisonment. 826 So.2d at 1071-72; see § 784.082, Fla. Stat. (1997) (providing that the offense is a third-degree felony). The petitioner's sentencing guidelines scoresheet, however, assessed forty points for severe victim injury and four points for a legal status violation. The scoresheet required a sentence of 80.4 months, which is longer than the statutory maximum. Consistent with section 921.001(5), the trial court imposed the longer sentence.
After the petitioner's conviction and sentence became final, he filed a motion under Florida Rule of Criminal Procedure 3.800(a) (used to correct an illegal sentence), contending that the points assessed on his scoresheet for severe victim injury and a legal status violation caused his sentence to exceed the statutory maximum, in *839 violation of Apprendi. The trial court denied relief, and the district court affirmed. Hughes, 826 So.2d at 1074-75. The First District Court of Appeal held, among other things, that Apprendi does not apply retroactively. Id. Since then, each of the district courts has agreed. See Burrows v. State, 890 So.2d 286, 287 (Fla. 2d DCA 2004); Enoch v. State, 873 So.2d 443 (Fla. 5th DCA 2004); Figarola v. State, 841 So.2d 576, 577 (Fla. 4th DCA 2003), notice invoking discretionary review filed, No. SC03-586 (Fla. Apr. 7, 2003); Brown v. State, 829 So.2d 286, 287 (Fla. 3d DCA 2002), cert. denied, 537 U.S. 1196, 123 S.Ct. 1263, 154 L.Ed.2d 1033 (2003).[3]

II. COMPREHENDING APPRENDI

The defendant in Apprendi was charged with possession of a firearm for an unlawful purpose, which under New Jersey law carried a maximum sentence of ten years' imprisonment. 530 U.S. at 468-70, 120 S.Ct. 2348. The trial court found that the defendant committed the offense while motivated by racial bias and therefore imposed an enhanced eighteen-year sentence under the state's "hate crime" statute. The issue was "whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." Id. at 469, 120 S.Ct. 2348. The Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348.

III. THE WITT RETROACTIVITY ANALYSIS
When the United States Supreme Court or this Court renders a decision favorable to criminal defendants, the question becomes: who may benefit from the decision? We have held that such decisions apply in all cases to convictions that are not yet finalthat is convictions for which an appellate court mandate has not yet issued. Smith v. State, 598 So.2d 1063, 1066 (Fla.1992) (holding that "any decision of this Court announcing a new rule of law, or merely applying an established rule of law to a new or different factual situation, must be given retrospective application by the courts of this state in every case pending on direct review or not yet final"), limited by Wuornos v. State, 644 So.2d 1000, 1007 n. 4 (Fla.1994) (reading Smith "to mean that new points of law established by this Court shall be deemed retrospective with respect to all non-final cases unless this Court says otherwise"), cert. denied, 514 U.S. 1069, 115 S.Ct. 1705, 131 L.Ed.2d 566 (1995); see also Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding "that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final").
Once a conviction is final, however, the State acquires an interest in the finality of the convictions. As we have previously stated,
[t]he importance of finality in any justice system, including the criminal justice system, cannot be understated. It has long been recognized that, for several reasons, litigation must, at some point, come to an end. In terms of the availability of judicial resources, cases must *840 eventually become final simply to allow effective appellate review of other cases. There is no evidence that subsequent collateral review is generally better than contemporaneous appellate review for ensuring that a conviction or sentence is just. Moreover, an absence of finality casts a cloud of tentativeness over the criminal justice system, benefitting neither the person convicted nor society as a whole.
Witt v. State, 387 So.2d 922, 925 (Fla.1980); see also United States v. Addonizio, 442 U.S. 178, 184 n. 11, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (noting that "[i]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures"). Therefore, the issue is whether such cases can be applied to defendants whose convictions already were final when the decision was rendered.
We analyze whether a change in decisional law should be applied retroactively under the framework outlined in Witt. There, we held that a change of law would not be deemed retroactive "unless the change: (a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." Id. at 931. In this case, it is clear, and the parties agree, that the first two prongs are met. Accordingly, the question is whether Apprendi constitutes a "development of fundamental significance." In Witt, we stated that most major constitutional changes fall within one of two categories: changes "which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties" and those "which are of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall and Linkletter." 387 So.2d at 929.[4] The holding in Apprendi does not fall within the first category. Therefore, the still narrower question is whether it is of sufficient magnitude as to require retroactive application. To decide that issue, we must consider the three factors of the Stovall/Linkletter test: (a) the purpose to be served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect of retroactive application of the rule on the administration of justice. Witt, 387 So.2d at 926. In Witt we described those decisional changes that do not meet this standard, and we are guided by this principle now:
In contrast to these jurisprudential upheavals are evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights of this genre, do not compel an abridgement of the finality of judgments. To allow them that impact would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit.
Id. at 929-30 (emphasis added). We address each of the Stovall/Linkletter factors in turn.

A. The Purpose To Be Served by the New Rule
The first factor we must consider under the Stovall/Linkletter test is the purpose to be served by the new rule. Witt, 387 So.2d at 926. To reiterate, the holding in Apprendi is that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed *841 statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The decision in Apprendi was intended to guard against erosion of the Sixth Amendment's guarantee of the right to jury trial, by requiring that a jury decide the facts supporting a sentence that exceeds the statutory maximum. See 530 U.S. at 483, 120 S.Ct. 2348. That rule is procedural, as is clear from the Supreme Court's statement that its concern was with the adequacy of New Jersey's criminal procedure. 530 U.S. at 475, 120 S.Ct. 2348 ("The substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's procedure is."); see also id. at 484, 120 S.Ct. 2348 (describing the reasonable doubt standard as a type of criminal procedure protection); Curtis v. United States, 294 F.3d 841, 843 (7th Cir.) (noting that "Apprendi is about nothing but procedure  who decides a given question (judge versus jury) and under what standard (preponderance versus reasonable doubt)"), cert. denied, 537 U.S. 976, 123 S.Ct. 451, 154 L.Ed.2d 334 (2002). The Court affirmed this understanding in Ring v. Arizona, 536 U.S. 584, 605, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which applied Apprendi to death penalty cases, when it characterized Apprendi as determining "`who decides,' judge or jury." See also Schriro v. Summerlin, 542 U.S. 348, ___, 124 S.Ct. 2519, 2523, 159 L.Ed.2d 442 (2004) (stating that "Ring altered the range of permissible methods for determining whether a defendant's conduct is punishable by death"). The effect of the rule is solely to shift factfinding responsibility from the judge to the jury and to increase the burden of proof for those facts that increase the penalty for a crime beyond its statutory maximum. See Summerlin, 124 S.Ct. at 2523. ("Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts."); United States v. Sanders, 247 F.3d 139, 148 (4th Cir.) (stating that the Apprendi rule "merely shifts the fact-finding duties from an impartial judge to a jury"), cert. denied, 534 U.S. 1032, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001).
Moreover, Apprendi permits a judge to continue to make these same factual determinations as long as the resulting sentence does not exceed the statutory maximum. See Harris v. United States, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (holding that the determination of whether a weapon was "brandished" to support the imposition of a mandatory minimum sentence was a sentencing factor to be found by the trial court, and the plurality explaining that a judge may determine a fact increasing the minimum sentence within the statutory maximum because the jury verdict already authorizes the sentence); see also Sepulveda v. United States, 330 F.3d 55, 60 (1st Cir.2003) (noting that the defendant's sentence was not "plucked out of thin air"; the judge determined it "based upon discrete findings of fact established by a fair preponderance of the evidence"). The Court was not concerned that the established procedure was fundamentally unfair. As the Court explained in Ring, "The Sixth Amendment jury trial right ... does not turn on the relative rationality, fairness, or efficiency of potential factfinders." 536 U.S. at 607, 122 S.Ct. 2428; accord Summerlin, 124 S.Ct. at 2525 ("When so many presumably reasonable minds continue to disagree over whether juries are better factfinders at all, we cannot say that judicial factfinding seriously diminishes accuracy.").
Apprendi does not affect the determination of guilt or innocence; it only requires that sometimes the jury, not the judge, must decide factual aspects of the sentencing decision. See Sepulveda, 330 F.3d at *842 60 (stating that "Apprendi's new rule not only fails to impugn the accuracy of convictions that became final beforehand but also falls short of rendering sentences imposed under the pre-Apprendi regime seriously inaccurate"); United States v. Brown, 305 F.3d 304, 309 (5th Cir.2002) (stating that Apprendi "did not change what the Government must prove, only that the jury, rather than the judge must decide" the question), cert. denied, 538 U.S. 1007, 123 S.Ct. 1919, 155 L.Ed.2d 840 (2003). Although Apprendi reflects due process concerns, it does not address a miscarriage of justice or effect a judicial upheaval to the degree necessary to require its retroactive application. See Coleman v. United States, 329 F.3d 77, 89 (2d Cir.2003) (stating that Apprendi "merely `clarified and extended' the scope of two well-settled principles of criminal procedure: the defendant's right to a jury trial and the government's burden of proof beyond a reasonable doubt"), cert. denied, 540 U.S. 1061, 124 S.Ct. 840, 157 L.Ed.2d 719 (2003). As the First District noted, "the plight of a defendant who is serving a sentence that was enhanced because of judge-decided factors is not necessarily any more severe than that of an equallysituated defendant whose sentence was enhanced based on jury-determined factors." Hughes, 826 So.2d at 1074.
Further supporting our analysis are cases from the United States Supreme Court and this Court. We begin with a pair of cases that closely parallel the situation here. In Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Supreme Court held that the Sixth Amendment right to a jury trial applies to the States through the Fourteenth Amendment. Concluding that this right is "fundamental to the American scheme of justice," the Court stated that this conclusion in no way impugned the integrity of bench trials. Id. at 149, 157-58, 88 S.Ct. 1444. The Court explained, "We would not assert, however, that every criminal trial  or any particular trial  held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury." Id. at 158, 88 S.Ct. 1444. The Court rejected the retroactive application of Duncan in DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968). Using the Linkletter standard we adopted in Witt, the Court cited the above-quoted language in Duncan and determined that "[t]he values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial." Id. at 634, 88 S.Ct. 2093. Thus, under the Linkletter standard we apply in this case, the Supreme Court did not consider the previous denials of jury trials in criminal cases to have been so fundamentally flawed or implicitly unfair that Duncan required retroactive application. As the Court explained in Johnson v. New Jersey, 384 U.S. 719, 728-29, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (holding that Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) was not retroactive), "the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process is necessarily a matter of degree." The decision not to apply a constitutional ruling retroactively "do[es] not disparage a constitutional guarantee in any manner." Id. at 728, 86 S.Ct. 1772.
By comparison, the rule in Apprendi, imposing a requirement that a jury, rather than the judge, must decide the facts affecting sentencing, is clearly of lesser stature than the decision in Duncan, which extended to the States the constitutional right to a jury trial. See State v. Towery, 204 Ariz. 386, 64 P.3d 828, 835 (2003) (using the Linkletter elements to hold that Ring did not apply retroactively and noting that "[i]f the basic right to a jury trial *843 does not apply retroactively, then a right to a jury determination of aggravating circumstances that function essentially as elements of a greater offense also does not apply retroactively"), cert. dismissed, 539 U.S. 986, 124 S.Ct. 44, 156 L.Ed.2d 702 (2003). Therefore, Apprendi does not implicate core values to the degree necessary to its retroactive application.
The Supreme Court's recent decision in Summerlin, 124 S.Ct. at 2519, further supports our conclusion. The Court in Summerlin considered whether the holding in Ring, which applied the Apprendi rule to death penalty cases, applied retroactively. Stating that rules "that regulate only the manner of determining the defendant's culpability are procedural," the Court held that the rule announced in Ring was procedural. Id. at 2523. The Court explained that because judicial fact-finding does not seriously diminish the reliability or accuracy of the fact-finding process, the earlier procedure by which judges found the facts relevant to sentencing is not fundamentally unfair. Id. at 2525. As to retroactivity, the Court concluded that "[i]f under DeStefano a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be." Id. at 2526.[5]
Nor does the failure to submit an element of a crime to the jury always require a remedy. In Neder v. United States, 527 U.S. 1, 8-9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the Supreme Court held that a trial court's determination of materiality in a tax fraud case, which violated United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding that materiality is an element for the jury), was not a structural error that rendered the trial fundamentally unfair. Rather, the Court held that although the failure to submit the element to the jury violated the right to a jury trial, the error was subject to harmless error analysis. 527 U.S. at 9, 12, 119 S.Ct. 1827. Thus, in the Supreme Court's view, a Sixth Amendment error does not automatically require a retrial even if a jury did not decide all the facts relevant to sentencing.
Chief Justice Pariente contends that Apprendi must be applied retroactively because of its extension of the beyond-a-reasonable-doubt standard of proof to findings of fact authorizing a sentence greater than that stemming directly from the jury verdict. Dissenting op. at 852. She relies on the Supreme Court's statement in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), discussing the importance of the reasonable doubt standard in reducing the risk of an inaccurate conviction. Although Apprendi did cite Winship for this principle, it does not follow that the decision is so fundamentally significant that it must be applied retroactively. First, the defendant already has been convicted based on the reasonable doubt standard.[6]Apprendi affects only the procedure for enhancing the sentence. See United States v. Sanchez-Cervantes, 282 F.3d 664, 671 (9th Cir.), cert. denied, 537 U.S. 939, 123 S.Ct. 48, 154 L.Ed.2d 243 (2002); see also State v. Tallard, 149 N.H. 183, 816 A.2d 977, 981 (2003) ("Apprendi altered the procedure under which an enhanced sentence can be imposed. It did not affect the procedure for obtaining an *844 accurate conviction on the underlying offense."). Thus, Apprendi "does not rise to the level of importance of Winship." Sanchez-Cervantes, 282 F.3d at 671. Further, "even in the post-Apprendi era, findings of fact made by the sentencing judge, under a preponderance standard, remain an important part of the sentencing regimen." Sepulveda, 330 F.3d at 60.
Analytically, the impact of failing to apply the reasonable doubt standard to a sentencing factor is certainly no more serious than the impact of omitting an element of a crime from the jury's consideration. Yet the Supreme Court has held that the latter is subject to harmless error analysis. See Neder, 527 U.S. at 9, 119 S.Ct. 1827 ("Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."). Thus, neither the accuracy of convictions nor of sentences imposed and final before Apprendi issued is seriously impugned. Id.
Finally, concerning Apprendi, we held in McGregor v. State, 789 So.2d 976, 977 (Fla. 2001), that a claim of Apprendi error must be preserved for review and we expressly rejected the assertion that such error is fundamental. The United States Supreme Court also rejected an unpreserved Apprendi claim in United States v. Cotton, 535 U.S. 625, 634, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). Under its plain error analysis, the Court held that even if an Apprendi error were presumed to have affected the defendant's substantial rights, "the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings." Id. at 632-33, 122 S.Ct. 1781. The Court concluded that "[t]he real threat then to the `fairness, integrity, and public reputation of judicial proceedings' would be if respondents, despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial." Id. at 634, 122 S.Ct. 1781; see also United States v. Sanchez-Cervantes, 282 F.3d 664, 670 (9th Cir.) (stating that because Apprendi claims are subject to a harmless error analysis, Apprendi is not a "bedrock procedural rule"), cert. denied, 537 U.S. 939, 123 S.Ct. 48, 154 L.Ed.2d 243 (2002). As the First District stated, "If an Apprendi violation can be harmless, it is difficult to logically conclude that the purpose behind the change of law in Apprendi is fundamentally significant." Hughes, 826 So.2d at 1074.
In Witt we rejected the retroactive application of changes of law "in the absence of fundamental and constitutional changes which cast serious doubt on the veracity or the integrity of the original proceeding." 387 So.2d at 929 (emphasis added). Apprendi shifted certain fact-finding from judge to jury and "clarified and extended" the right to a jury trial to require the State to prove convictions beyond a reasonable doubt by applying the standard to certain factors affecting sentencing under certain conditions. United States v. Mora, 293 F.3d 1213, 1219 (10th Cir.), cert. denied, 537 U.S. 961, 123 S.Ct. 388, 154 L.Ed.2d 315 (2002). But Apprendi does not impugn the "very integrity of the fact-finding process" or present "the clear danger of convicting the innocent." Johnson v. New Jersey, 384 U.S. 719, 728, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (quoting Linkletter, 381 U.S. at 639, 85 S.Ct. 1731). It announced an emerging right of procedural fairness that does not compel the disruption of final judgments. See Witt, 387 So.2d at 929 (stating that "[e]mergent rights in these categories [e.g., procedural fairness] ... do not compel an abridgement of the finality of judgments").

*845 B. The Extent of Reliance on the Old Rule
The second factor under the Stovall/Linkletter test is the extent of reliance on the old rule. Witt, 387 So.2d at 926. Trial courts have long exercised discretion in sentencing. Moreover, since 1994 our trial courts have been permitted to impose sentences exceeding the statutory maximums based on the judge's factual findings made under the sentencing guidelines and the Criminal Punishment Code. See § 921.001(5), Fla. Stat. (Supp.1994); § 921.0024(2), Fla. Stat. (Supp.1998). Therefore, when Apprendi was decided there had been a considerable period of reliance on this principle in sentencing under both the guidelines and the Code.

C. Effect of Retroactive Application on the Administration of Justice
The third and final factor is the effect of retroactive application on the administration of justice. Witt, 387 So.2d at 926. Two district courts of appeal have stated that retroactive application of Apprendi would have a far-reaching adverse impact on the administration of justice. As the Fifth District noted,
virtually every sentence involving a crime of violence that has been handed down in Florida for almost two decades has included a judicially-determined victim injury component to the guidelines score. Justice O'Connor's observation that the effect of Apprendi to guidelines sentencing would be "colossal" barely describes the cataclysm in Florida if such sentences are invalidated because the jury did not make the "victim injury" finding.
McCloud v. State, 803 So.2d 821, 827 (Fla. 5th DCA 2001) (en banc), review denied, 821 So.2d 298 (Fla.), cert. denied, 537 U.S. 1036, 123 S.Ct. 553, 154 L.Ed.2d 455 (2002). In this case, the First District concluded that the impact on the administration of justice "would be monumental." Hughes, 826 So.2d at 1074. As the court noted, "[e]ach and every enhancement factor that was determined by a judge and which resulted in a sentence above the statutory maximum will either have to be stricken completely and the sentences recalculated without the factor (which in itself is a laborious process), or a jury will have to be empaneled to decide those factors." Id.
Also, as previously stated, an Apprendi error must be preserved for review and does not constitute fundamental error. McGregor, 789 So.2d at 977. Therefore, if Apprendi were applied retroactively, defendants convicted before Apprendi but who preserved the issue would be in a better position than defendants convicted after Apprendi, but who did not preserve it.
To apply Apprendi retroactively would require review of the record and sentencing proceedings in many cases simply to identify cases where Apprendi may apply. In every case Apprendi affects, a new jury would have to be empaneled to determine, at least, the issue causing the sentence enhancement. In most cases, issues such as whether the defendant possessed a firearm during the commission of a crime, the extent of victim injury or sexual contact, and whether a child was present (to support use of the domestic violence multiplier) cannot be considered in isolation.[7] Many, if not all, of the surrounding facts *846 would have to be presented. In others, a jury would have to determine factors unrelated to the case (e.g., whether legal status points may be assessed).
In the numerous cases we have decided under Witt, we have "rarely f[ound] a change in decisional law to require retroactive application." Mitchell v. Moore, 786 So.2d 521, 529 (Fla.2001) (noting that the Court had decided over sixty retroactivity cases at that time). Based on our consideration of the Stovall/Linkletter factors, we conclude that the new criminal procedure rule announced in Apprendi does not warrant retroactive application.

IV. DECISIONS OF OTHER JURISDICTIONS
We also find it persuasive that all but one of the federal courts of appeals have expressly considered the issue, albeit under a different retroactivity analysis, and not one has held Apprendi to apply retroactively.[8] Several state courts also have considered the issue, and again not one has held Apprendi to apply retroactively.[9] Finally, *847 the United States Supreme Court has held that Ring, which applied Apprendi in the death penalty context, does not apply retroactively. See Summerlin, 124 S.Ct. at 2526.[10]
Justice Anstead criticizes our reliance on these cases because they employ a different standard for determining retroactivity. See infra at 857 (Anstead, J., dissenting). Federal courts, and the majority of state courts, now use the standard articulated in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), which was decided after our decision in Witt.[11] Under Teague, decisions announcing new constitutional rules apply retroactively on collateral review only under two circumstances: (1) decisions placing conduct beyond the power of the government to proscribe; and (2) decisions announcing a "watershed" rule of criminal procedure that is "implicit in the concept of ordered liberty." 489 U.S. at 311, 109 S.Ct. 1060. While the standards of Teague are different from those of Witt, they are based on many of the same concerns. Compare Teague, 489 U.S. at 309, 109 S.Ct. 1060 (noting that "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system"), with Witt, 387 So.2d at 925 (noting that "[t]he importance of finality in any justice system, including the criminal justice system, cannot be understated.").[12] Therefore, although we should conduct our own analysis under the Witt standard (and have done so) we should not blind ourselves to how other courts interpret Apprendi. We consider it relevant, though not dispositive, that no court anywhere in the country, whether state or federal, has held Apprendi to apply retroactively.
Regardless of the standard used, we find it persuasive that courts unanimously consider Apprendi to be a rule of procedure *848 that simply changes who decides certain sentencing issues. Moreover, we have not, as the dissent suggests, relied only on cases that have analyzed retroactivity under Teague. As we explained earlier, the Supreme Court used the same standard we adopted in Witt in holding that the right to a jury trial itself is not so fundamental as to require retroactive application. See DeStefano, 392 U.S. at 633-34, 88 S.Ct. 2093. If, using the same analysis as we did in Witt, the right to jury trial itself is not retroactive, we fail to see how a subset of that right  a jury determination of facts relevant to sentencing  can be retroactive.

V. CONCLUSION
In its decision below, the First District Court of Appeal considered other issues that are rendered moot in light of our decision that Apprendi does not apply retroactively. See McCoy v. United States, 266 F.3d 1245, 1255-56 (11th Cir.2001) (deciding the retroactivity issue first because "if Apprendi does not apply retroactively, this alone resolves the case"), cert. denied, 536 U.S. 906, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002). Therefore, we answer the certified question in the negative, approve the decision, and approve the opinion below to the extent that it holds Apprendi does not apply retroactively.
It is so ordered.
WELLS, QUINCE, and BELL, JJ., concur.
LEWIS, J., concurs in result only with an opinion.
PARIENTE, C.J., and ANSTEAD, J., dissent with opinions.
LEWIS, J., concurring in result only.
In the present noncapital case, I agree that Apprendi is inapplicable. The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), was confronted with the issue of whether a judge, sitting without a jury, could conduct the fact-finding necessary to enhance a defendant's sentence by two years under a "hate-crimes" statute. In conducting its analysis, the Supreme Court first acknowledged the importance of the interests that were at stake, see id. at 476, 120 S.Ct. 2348 ("At stake in this case are constitutional protections of surpassing importance."), and the Court then announced a bright-line rule of law that would protect those interests appropriately: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348.
Two years later, the United States Supreme Court in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), applied Apprendi's bright-line rule to capital cases, holding as follows: "Because... aggravating factors operate as `the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." Ring, 536 U.S. at 609, 122 S.Ct. 2428 (citation omitted). The Court explained further:
The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death.
Id. at 609, 122 S.Ct. 2428. Based on language in both Apprendi and Ring, these decisions initially appeared to implicate constitutional interests of the highest order and seemed to go to the very heart of the Sixth Amendment. And yet, two years after Ring was decided, the Supreme *849 Court appears to have somewhat altered the foundation.
When asked to decide the retroactivity of Ring, the United States Supreme Court in Schriro v. Summerlin, 124 S.Ct. 2519, 2526, first explained that "[t]his holding [in Ring] did not alter the range of conduct Arizona law subjected to the death penalty" and that Ring therefore was procedural rather than substantive. Summerlin, 124 S.Ct. at 2523. Second, the Court relied upon its own prior decision in DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (declining to give retroactive application to a 1968 decision that extended the jury-trial guarantee to the states), and concluded that Ring did not establish a "watershed rule of criminal procedure":
If under DeStefano a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be.
Summerlin, 124 S.Ct. at 2526. The Court then held: "Ring announced a new procedural rule that does not apply retroactively to cases already final on direct review." Id.
Based on Summerlin  as surprising as that decision may be[13] in light of the Supreme Court's own prior language in Apprendi and Ring  I can only conclude that Apprendi simply cannot be applied retroactively in Florida upon application of our Witt[14] analysis. The United States Supreme Court is the ultimate arbiter of the federal constitution, and the decision in Ring is that Court's own Sixth Amendment interpretation and application as it extended the Apprendi principles into the capital context. If the United States Supreme Court has held and stated that Apprendi principles as applied in the capital context in Ring is not a "watershed rule of criminal procedure" but merely a "new procedural rule that does not apply retroactively," then I am precluded from determining that these decisions have fundamental significance, are of significant magnitude or constitute a "jurisprudential upheaval" under Florida law, even though if writing upon a clean slate I would certainly do so. Further, the purpose served by a new rule of law is a key factor in determining retroactivity in Florida,[15] and the United States Supreme Court in DeStefano held that the purpose served by the jury-trial guarantee ("to prevent arbitrariness and repression") "favor[s] only prospective application" of that guarantee to the states.[16] Therefore, I cannot logically say that the purpose served by the jury fact-finding requirement of Apprendi favors a different treatment in this regard.
Based on the foregoing, I must agree that Apprendi is inapplicable in this postconviction case.
PARIENTE, C.J., dissenting.
I conclude that the constitutional requirement of proof beyond a reasonable *850 doubt of sentence-enhancing facts under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), renders Florida's sentencing guidelines between 1994 and 1998 unconstitutional as applied in some cases. I further conclude that this determination, which results in a limitation of the holding of our decision in Mays v. State, 717 So.2d 515 (Fla.1998), must be applied retroactively. I write separately to discuss what I believe is a missing step in the majority's analysis  a determination of the effect of Apprendi on the guidelines scheme resulting in Hughes' sentence  and to explain why I believe we should retroactively apply Apprendi's holding that facts authorizing a sentence in excess of the statutory maximum must be found beyond a reasonable doubt.

NARROWING THE ISSUE
Although the First District certified to us the question of Apprendi's retroactivity in general, the validity of Hughes' sentence in this case depends on the answer to two narrower questions: Does Apprendi render the guidelines scheme under which Hughes was sentenced unconstitutional as applied, and if so, does this determination retroactively render his sentence illegal? As the First District recognized, the first question requires us to assess the continuing validity of our decision in Mays. Deciding an issue of statutory interpretation, this Court in Mays held that under section 921.0015(5), Florida Statutes (1995), trial courts were authorized to impose any sentence within a range twenty-five percent above and below the median recommended sentence if any portion of that range exceeded the statutory maximum. Unlike Apprendi, Mays did not concern who  judge or jury  finds sentence-enhancing facts, or whether such facts must be found beyond a reasonable doubt.
As noted by Justice Anstead in his separate dissenting opinion, the sentence in this case was imposed during the four-year period in which guidelines sentences could exceed the statutory maximum as authorized by Mays. See dissenting op. (Anstead, J.) at 866. The trial court, using a guidelines scoresheet that included 40 points for severe victim injury, imposed a sentence of 80.4 months, which exceeded the five-year statutory maximum for battery on a jail detainee, a crime that necessarily includes victim contact but not victim injury. If 18 points for moderate injury had been assessed, Hughes' maximum guidelines sentence would have been 73 months, and if 4 points for slight injury had been scored, the top guidelines sentence would have been 55.5 months.
In affirming the denial of Hughes' motion to correct his sentence, the First District stated:
Because the addition of these victim injury points caused the appellant's sentence to exceed the statutory maximum, the addition of these points by the judge violates the rule announced in Apprendi. Contrary to the trial court's ruling that the appellant's sentence is authorized under Mays v. State, we conclude that the United States Supreme Court effectively overruled Mays as to scoring factors that are neither alleged in the information nor found by a jury beyond a reasonable doubt. Thus, the only remaining question is whether the rule in Apprendi applies retroactively to the appellant's sentence, which became final prior to the date Apprendi was decided.
Hughes v. State, 826 So.2d 1070, 1072 (Fla. 1st DCA 2002). Relying on its determination that Apprendi had the effect of overruling Mays, the First District certified the question of retroactivity of Apprendi to this Court. See id. at 1075.
The First District's holding that Apprendi "overruled Mays as to scoring factors that are neither alleged in the information nor found by a jury beyond a *851 reasonable doubt," Hughes, 826 So.2d at 1072, is only partially correct. More accurately, Apprendi narrows Mays: the trial court may impose a guidelines sentence exceeding the statutory maximum as long as the facts resulting in the guidelines range either inhere in the verdict or plea, or rest solely on the bare existence of prior convictions. It is the retroactivity of Apprendi's effect on Mays, not the retroactivity of Apprendi generally, that is at issue. This Court has an obligation to specifically identify the new rule of decisional law under consideration for retroactive application, because under Witt v. State, 387 So.2d 922 (Fla.1980), only decisions by this Court and the United States Supreme Court may be given retroactive application. Precision in identifying both the old and new rules is important also because considerations of the degree of reliance on the old rule and the effect of retroactive application on the administration of justice are factors in a Witt retroactivity analysis.

THE REASONABLE DOUBT STANDARD
Two aspects of Apprendi are relevant to a determination of retroactivity. The first concerns the identity of the decisionmaker, and is a function of the Sixth Amendment right to trial by jury. The second concerns the burden of proof, and is governed by the Fifth and Fourteenth Amendments' guarantee of due process of law. Although the Apprendi majority characterized both constitutional protections as being of "surpassing importance," 530 U.S. at 476, 120 S.Ct. 2348, I agree with the majority that Apprendi's holding that the jury must decide facts authorizing a particular sentence created a new procedural rule that is not retroactive under Witt. Therefore, I cannot fully join Justice Anstead's dissent. However, I conclude that the determination in Apprendi that facts authorizing a particular sentence must be found beyond a reasonable doubt is a new rule of substantive law that warrants retroactive application under Witt. I would therefore vacate Hughes' sentence and direct that he be resentenced in accord with Apprendi.
My conclusions on the retroactivity of the two prongs of the holding in Apprendi are informed by the recent United States Supreme Court decision in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). There the Court held that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which extended Apprendi to capital sentencing, was not retroactive under the test of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Neither Ring nor Summerlin involved a question on the burden of proof of sentence-enhancing factors. The Arizona capital sentencing law that was challenged in both cases required that aggravating factors be proved to the court beyond a reasonable doubt, the same standard that would have applied in a jury trial. See Summerlin, 124 S.Ct. at 2522 n. 1 (observing that "[b]ecause Arizona law already required aggravating factors to be proved beyond a reasonable doubt, ... that aspect of Apprendi was not at issue in Ring"). Regarding the right to a jury determination of death-qualifying aggravating factors, the Court concluded in Summerlin that the evidence is "simply too equivocal" that judicial fact-finding seriously diminishes the accuracy of capital sentencing. See id. at 2525. The Court then pointed to its decision in DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968), in which it held that its decision in Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), applying the Sixth Amendment's jury trial guarantee to the states was not retroactive:
We noted that, although "the right to jury trial generally tends to prevent arbitrariness *852 and repression[,] ... `[w]e would not assert ... that every criminal trial  or any particular trial  held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury.'" 392 U.S., at 633-634, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (quoting Duncan, supra, at 158, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491). We concluded that "[t]he values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial." 392 U.S., at 634, 88 S.Ct. 2093, 20 L.Ed.2d 1308. If under DeStefano a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be.
Summerlin, 124 S.Ct. at 2525-26.
In contrast, the fundamental due process requirement of proof beyond a reasonable doubt increases the accuracy of criminal proceedings. The United States Supreme Court has made clear that for purposes of criminal punishment, an accurate proceeding is one in which the evidence of guilt overcomes the presumption of innocence through proof beyond a reasonable doubt:
The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence  that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law." Coffin v. United States, [156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895)].... "[A] person accused of a crime ... would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice in a civil case."
The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.
In re Winship, 397 U.S. 358, 363-64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (emphasis supplied) (quoting In re W., 24 N.Y.2d 196, 299 N.Y.S.2d 414, 247 N.E.2d 253, 259 (1969) (Fuld, C.J., dissenting)). The Court held in Winship that the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged." Id. at 364, 90 S.Ct. 1068.
In Apprendi, the Court stated that in decisions relying on Winship, it had "made clear beyond peradventure that Winship's due process and associated jury protections extend, to some degree, `to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence.'" 530 U.S. at 484, 120 S.Ct. 2348 (quoting Almendarez-Torres v. United States, 523 U.S. 224, 251, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (Scalia, J., dissenting)). The Court in Apprendi thus held that the "reasonable doubt" standard required by due process of law extended to the finding of facts authorizing a sentence greater than that authorized solely by the facts implicitly found in the jury's verdict of guilt of a statutorily defined crime. *853 More recently, the United States Supreme Court extended Apprendi to guidelines sentencing schemes used to impose a sentence beyond the sentence authorized by the defendant's guilty plea. See Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 2543, 159 L.Ed.2d 403 (2004).
As to Apprendi's determination that facts authorizing a sentence beyond that authorized by a jury verdict or guilty plea must be found beyond a reasonable doubt, I agree with Justice Anstead that Apprendi is a decision of fundamental significance warranting retroactive application under the test of Witt. In this respect, the significance of Apprendi's holding as to the reasonable doubt standard places it at least on a par with the decisions identified by Justice Anstead which we have held retroactive. See dissenting op. (Anstead, J.) at 855-57 note 21. Moreover, I agree with Justice Anstead that the courts did not heavily rely on the old rule permitting judicial fact-finding that led to sentences exceeding the statutory maximum during the period from 1994 to 1998.
Regarding the final Witt criterion, the effect on the administration of justice, because relatively few sentences will be affected by our recognition of Apprendi's limitation of Mays, I disagree with the conclusion of the First District and the majority here that the effect of retroactivity on the administration of justice would be "monumental." Majority op. at 845 (quoting Hughes, 826 So.2d at 1074). As Justice Anstead observes, the guidelines rules authorizing a sentence exceeding the statutory maximum were in effect for only four years, and relatively few sentences imposed during that period are affected by Apprendi. See dissenting op. (Anstead, J.) at 866. Fewer still of these sentences remain in effect at this point, more than six years after the elimination of the rule authorizing the type of sentence imposed here.[17] The effect on the administration of justice would be reduced even further if, consistent with my analysis herein, only the prong of Apprendi requiring proof of sentence-enhancing facts beyond a reasonable doubt is applied retroactively to sentences imposed under this version of the guidelines. This is because any dispute over the existence of the sentence-enhancing fact could be resolved by a judge; no jury would have to be impaneled.
I further agree with Justice Anstead that we should adhere to the Witt test rather than adopt the federal test enunciated in Teague, whose purpose is to limit federal habeas review of final state court judgments.
In response to the majority's reliance on precedent characterizing Apprendi as concerning "nothing but procedure," majority op. at 841 (quoting Curtis v. United States, 294 F.3d 841, 843 (7th Cir.2002)), I conclude that this characterization minimizes the fundamental significance of the requirement *854 of proof beyond a reasonable doubt of any fact necessary to authorize a criminal punishment. Winship and its progeny demonstrate that whether characterized as procedural or substantive, the due process requirement of proof beyond a reasonable doubt in criminal proceedings is an absolutely indispensable component of the American system of criminal justice.
The assessment of victim injury points under Florida's sentencing guidelines does not satisfy the reasonable doubt standard that Apprendi imposes upon fact-finding that increases the authorized sentence. In fact, no particular burden of proof is set out in the guidelines rules, the corresponding statutes, or judicial precedent. The absence of a burden of proof comports with the United States Supreme Court's observation in McMillan v. Pennsylvania, 477 U.S. 79, 91, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), that "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." The burden of proof for these sentence-enhancing factual determinations is certainly no greater than the preponderance standard governing departure sentences. See § 921.001(4)(a)(6), Fla. Stat. (2004) ("The level of proof necessary to establish facts that support a departure from the sentencing guidelines is a preponderance of the evidence.").

THIS CASE
The sentence in this case clearly violates Apprendi's requirement of proof beyond a reasonable doubt of facts increasing the authorized sentence. Hughes was convicted of battery on a fellow jail detainee. As noted above, Hughes' 80.4-month sentence, which exceeded the 60-month statutory maximum, rested in large part on the assessment of 40 victim injury points for severe victim injury. In effect, Hughes was convicted of a lesser offense on proof of each element beyond a reasonable doubt, then punished for a greater offense containing an additional element under a lower burden of proof. The failure to find severe victim injury beyond a reasonable doubt has resulted in a sentence exceeding the sentence authorized by the jury verdict, contrary to Apprendi.[18]
For the reasons I have stated, I would vacate the sentence in this case, direct the district court to remand for the trial court to determine victim injury under the reasonable doubt standard extended in Apprendi to facts increasing the maximum authorized sentence, and, if necessary, resentence Hughes accordingly.
*855 ANSTEAD, J., dissenting.
I respectfully dissent.
In essence, with the decisions rendered today in this case and in Johnson v. State, No. SC03-1042, 904 So.2d 400, 2005 WL 977017 (Fla. Apr. 28, 2005), the majority has reduced to insignificance two of the most important United States Supreme Court decisions rendered in modern times impacting our criminal law and our death penalty jurisprudence. See Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[19] In Florida, countless persons are serving sentences, in many instances life sentences, or are awaiting execution of the death penalty, all in violation of their right to a trial by jury under the Sixth Amendment to the U.S. Constitution; the majority nevertheless concludes that we are not going to do anything about it.
In doing so, it appears that the majority has failed to properly apply the test this Court long ago established for determining retroactivity in Witt v. State, 387 So.2d 922 (Fla.1980), and instead has relied upon an irrelevant federal standard never adopted by this Court. While it appears that Apprendi may not be retroactively applied under the federal standard, depending upon the context in which the issue is presented, we have long ago decided, for very good reasons, to apply a very different standard in Florida as outlined in Witt.[20]

Witt
Although the majority purports to examine the question of Apprendi's retroactivity pursuant to Witt, it ignores our precedent and those Florida cases where this retroactivity analysis was actually applied. In fact, if it had examined precedent, it would have found that we have applied numerous decisions retroactively; and many of these decisions, while important in their own right, were of far less significance than the United States Supreme Court's landmark holding in Apprendi.[21] There is simply no *856 *857 way that our holding today can be squared with our own prior retroactivity decisions applying Witt.
In addition to ignoring our own cases, the majority's conclusions are further flawed by the fact that they rely almost exclusively on federal decisions that evaluate retroactivity under the irrelevant and considerably more restrictive federal standard announced in the plurality opinion in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), rather than the controlling standard we adopted in Witt. In failing to honor our established law in Witt and its progeny, the majority reduces to insignificance the United States Supreme Court's landmark decisions in Apprendi and Ring,[22] as well as the Court's most recent Apprendi application in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

Witt vs. Teague
Obviously, there are fundamental and critical differences between the federal retroactivity rule and the rule for retroactivity we adopted in Witt. Tellingly, as in Teague, the majority analysis appears to singularly rely upon the value of finality in its analysis and conclusion, while wholly disregarding the fundamental importance of the constitutional right to a jury trial to the American justice system. Although I agree that "the importance of finality in any justice system, including the criminal justice system, cannot be understated," see Witt, 387 So.2d at 925, finality must be balanced by fairness. See Ferguson v. State, 789 So.2d 306, 312 (Fla.2001) (stating that the final Stovall/Linkletter "consideration in the retroactivity equation requires a balancing of the justice system's goals of fairness and finality").[23] As has already been eloquently stated in Witt:
The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications. Thus, society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice. Considerations of fairness and uniformity make it very "difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases."
Witt, 387 So.2d at 925 (emphasis added) (quoting Standards Relating to Postconviction Remedies 37 (Approved Draft 1968)); see also State v. Callaway, 658 So.2d 983, 987 (Fla.1995) ("The concern for fairness and uniformity in individual cases outweighs any adverse impact that retroactive application of the rule might have on decisional finality.").
*858 Today, contrary to our admonitions in Witt and Callaway, the majority has indeed rendered a decision "depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases." The majority has simply turned a blind eye to the most important and unique feature of the American justice system upon which we have relied for centuries to ensure fairness and justice for our citizens: the right to trial by jury. No other right in our system has been so jealously guarded, until today.

Apprendi is a Decision of Fundamental Significance
The majority acknowledges that the Witt test is comprised of three elements: (1) a change of law that emanates either from this Court or the United States Supreme Court; (2) is constitutional in nature; and (3) has fundamental significance. See Witt, 387 So.2d at 931. Further, the majority acknowledges that the decision in Apprendi meets the first two prongs of the Witt test for retroactive application: it is a decision that emanates from the United States Supreme Court and it is constitutional in nature. See Witt, 387 So.2d at 930. Hence, my disagreement with the majority rests on the majority's rejection of Apprendi as a decision of fundamental significance.

Fundamental Significance
It is difficult to comprehend the majority's conclusion that the Apprendi decision is not one of fundamental significance. That it is such a decision is apparent on both the face of the Apprendi opinion and upon any fair appraisal of its significance to the American justice system. In fact, its fundamental significance has just recently been emphatically affirmed by the United States Supreme Court in its decision in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).
For starters, the majority's conclusion directly conflicts with the clear and unambiguous characterization of the significance of the decision set out in the United States Supreme Court opinion in Apprendi itself:
At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," Amdt. 6. Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."
Apprendi, 530 U.S. at 476-77, 120 S.Ct. 2348 (footnote omitted) (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)). Surely this language resolves any doubt as to the fundamental significance of the Court's decision. One might logically ask how a decision mandating "constitutional protections of surpassing importance" could be categorized as anything other than a decision of fundamental significance.
Moreover, the Supreme Court's opinion described New Jersey's statutory scheme that allowed a judge to find the facts necessary to increase a defendant's sentence beyond the statutory maximum as "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." Id. at 497, 120 S.Ct. 2348. Tellingly, the principal dissent in Apprendi also recognized its importance as a groundbreaking change in the law. See Apprendi, 530 U.S. at 524, 120 S.Ct. 2348 (O'Connor, J., dissenting) (referring to Apprendi as a "watershed change in constitutional law"). Today, that "watershed change in constitutional law" is *859 brushed off by the majority as a minor procedural convenience.[24]
As if the Court's words in Apprendi were not enough, let us consider the words most recently used by the Court in Blakely in assessing the fundamental significance of the Apprendi decision:
Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed.1981) (describing the jury as "secur[ing] to the people at large, their just and rightful control in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850) ("[T]he common people, should have as complete a control ... in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958) ("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); Jones v. United States, 526 U.S. 227, 244-248, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.
....
Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law *860 ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As Apprendi held, every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment. Under the dissenters' alternative, he has no such right. That should be the end of the matter.
Blakely, 124 S.Ct. at 2538-43 (emphasis supplied). Hence, Blakely expressly rejects any characterization of Apprendi as a "mere procedural formality" and instead notes that Apprendi enforces the "fundamental reservation of power in our constitutional structure" to our people by the right of trial by jury. Today's majority, contrary to this declaration in Blakely, treats Apprendi as enforcing a "procedural formality" in all contexts.
In essence, the majority has ignored the plain meaning of the words "fundamental significance" as well as the plain meaning of the actual words used by the United States Supreme Court in Apprendi and Blakely describing the nature and importance of its decision upholding the right of an American citizen to due process and a trial by jury. When the Supreme Court's characterization of its decision is considered, the conclusion that Apprendi is a decision of fundamental significance should be a "no-brainer," a "slam dunk."[25]
*861 Further, when the holding of Apprendi is objectively examined through the Witt lens, without the muddying effect of federal decisions employing the irrelevant retroactivity analysis from Teague, it becomes apparent that Apprendi is a judicial decision of fundamental significance that should be applied retroactively. Whether you do the math quickly by examining the United States Supreme Court's own description of the significance of its decision, or do a detailed analysis, the answer under Witt is the same.

Federal Review Policy and Teague

Of course, as noted above, Florida has never adopted the federal Teague standard, which was fashioned upon considerations wholly inapplicable to state law systems. Instead, Florida has adopted its own standard for evaluating the critical issue of whether an important judicial decision should be applied retroactively based upon considerations of fairness and justice and has found retroactivity appropriate in numerous cases, many of obviously less significance than Apprendi.[26] As noted above, the majority has essentially chosen to ignore those cases decided under Witt, and to rely upon federal decisions controlled by Teague.
There are, of course, good reasons why this Court and other state courts have chosen not to embrace Teague. As the Missouri Supreme Court accurately and pointedly noted in a recent opinion rejecting the adoption of the Teague standard, "it has been suggested that `[t]he Teague test essentially prevents state courts from achieving their goal [of correcting injustice], for through its focus on the impropriety of disturbing a final conviction, it diverts attention from constitutional violations and prohibits relief except in the very rare case.'" State v. Whitfield, 107 S.W.3d 253, 268 n. 15 (Mo.2003) (alterations in original) (quoting Mary C. Hutton, *862 Retroactivity in the States: The Impact of Teague v. Lane on State Postconviction Remedies, 44 Ala. L.Rev. 421, 450 (1993)); see also Colwell v. State, 118 Nev. 807, 59 P.3d 463 (2002).
In the article cited approvingly by the Missouri high court, Hutton joins a host of other legal commentators in urging states to exercise their prerogative to develop alternative methods of determining retroactivity because many of the policy reasons behind Teague are not applicable to state postconviction procedures. In fact, the plurality opinion in Teague has been universally criticized by legal commentators "as being fundamentally unfair, internally inconsistent, and unreasonably harsh." Tung Yin, A Better Mousetrap: Procedural Default as a Retroactivity Alternative to Teague v. Lane and the Antiterrorism and Effective Death Penalty Act of 1996, 25 Am. J.Crim. L. 203, 206 (1998); see also Christopher S. Strauss, Comment, Collateral Damage: How the Supreme Court's Retroactivity Affects Federal Drug Prisoners' Apprendi Claims on Collateral Review, 81 N.C. L.Rev. 1220, 1222 (March 2003) (noting with regard to retroactivity that the Supreme Court "has crafted a theoretically incoherent doctrine that has proven difficult to apply"); Linda Meyer, "Nothing We Say Matters": Teague and New Rules, 61 U. Chi. L.Rev. 423, 423 (1994) (stating that Teague rules "wear[] away the power of precedent itself, stripping prior cases of all persuasive force beyond their particular factual contexts"); Susan Bandes, Taking Justice to Its Logical Extreme: A Comment on Teague v. Lane, 66 S. Cal. L.Rev. 2453, 2466 (1993) ("For a case whose articulated purpose was to promote fairness and evenhanded justice, Teague has served neither goal."); Marc M. Arkin, The Prisoner's Dilemma: Life in the Lower Federal Courts After Teague v. Lane, 69 N.C. L.Rev. 371, 418 (1991) ("There is much concern that Teague will eviscerate federal habeas corpus and rob the lower federal courts of their proper function of providing as of right review for all federal constitutional issues in criminal cases, substituting discretionary Supreme Court review, and, in the process, retarding the articulation of federal rights."); David R. Row, Teague and Death: The Impact of Current Retroactivity Doctrine on Capital Defendants, 19 Hastings Const. L.Q. 23 (1991) (commenting on general problems with Teague, as well as how these problems are of particular concern in the capital context); Eliot F. Krieger, The Court Declines in Fairness  Teague v. Lane, 109 S.Ct. 1060 (1989), 25 Harv. C.R.-C.L. L.Rev. 164, 182 (1990) ("Frank Teague is not the only loser. The Teague bar may effectively slam the door on most federal review of state criminal cases and permanently stunt the evolution of constitutional jurisprudence."); Roger D. Branigan, Note, Sixth Amendment  The Evolution of the Supreme Court's Retroactivity Doctrine: A Futile Search for Theoretical Clarity, 80 J.Crim. L. & Criminology 1128, 1129 (1990) (suggesting that Teague has "eliminat[ed] the safeguards of fundamental fairness that come from examining the nature and purposes of proposed rules").

Federal Habeas Review
Virtually all of these commentators focus on the important differences between habeas corpus proceedings in state courts compared to the very different role played by the additional and limited habeas review of state court convictions conducted in federal proceedings. Importantly, any examination of the Teague standard should begin with the obvious: that the Teague plurality's main focus and concern in adopting a more restrictive view of retroactivity was to limit the scope of federal habeas review of state convictions, an issue supportive of our adoption of a distinct retroactivity analysis in Witt. While there is ongoing debate about the wisdom and *863 fairness of this limitation, the major focus of this concern with the proper scope of federal habeas is associated with an understandable reluctance of the federal courts to interfere with a state's own review of its cases, and the proper scope of rules of collateral attack in federal courts on claims by state prisoners who have already litigated their claims in state courts.

Teague and Cumulative Federal Review
In short, issues of the availability of cumulative federal review of issues already resolved in state proceedings should not determine this Court's substantive standard for retroactivity to be applied in state postconviction proceedings. It would make little sense for state courts to adopt the Teague analysis when a substantial part of Teague's rationale is deference to a state's substantive law and review. If anything, the more restrictive standards of federal review place increased and heightened importance upon the quality and reliability of the state proceedings. In other words, if the state proceedings become the only real venue for relief, as they in fact have become, it is critically important that the state courts provide that venue and "get it right" since those proceedings will usually be the final and only opportunity to litigate collateral claims. In fact, it is the presumed heightened quality of state proceedings that allows the federal courts to defer to the state proceedings as adequate safeguards to the rights of state prisoners. To then further restrict the state proceedings would undermine the entire rationale for restricting federal proceedings because of the reliability of state proceedings. Yet, this is essentially what the majority opinion has done here in its reliance on federal authority  to elevate the federal concern with finality over the state's concern with fairness and justice as the controlling value in its analysis.

Fundamental Significance under Witt

When all is said and done, however, as even the majority is forced to acknowledge, it is clear that we are bound to apply the Witt standard here. But while the majority appears to go through this exercise, its analysis is flawed because of its implicit reliance upon the Teague rationale and federal cases applying that rationale, rather than an examination of the numerous instances this Court has found retroactivity under Witt.
As the majority does not dispute, when analyzing a change in the law under the development of fundamental significance prong of the Witt test, this Court has ruled that it will also consider the three so-called Stovall/Linkletter factors to determine whether a change in the law constitutes a development of fundamental significance. Witt, 387 So.2d at 926. Those factors are: "[1] the purpose to be served by the new rule; [2] the extent of reliance on the old rule; and [3] the effect on the administration of justice of a retroactive application of the new rule." Id.

Purpose of New Rule
The first factor requires us to examine the purpose to be served by the new rule. The majority states that the rule to be taken from Apprendi is "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 120 S.Ct. 2348. While that is an accurate statement, the majority's subsequent analysis and characterization of the Apprendi holding reads as though the Supreme Court was merely correcting an innocuous and inconsequential technical procedural error. The majority's conclusion that Apprendi's purpose was of minor significance is, under any construction, directly at odds with the Supreme Court's *864 express language regarding the significance of the fundamental constitutional rights at stake both in Apprendi, and, more recently, in Blakely.[27]
As discussed above, and contrary to the majority's assessment and valuation of the constitutional right to due process and trial by jury, the purpose of the rule announced in Apprendi was expressly characterized in the United States Supreme Court's majority opinion as providing "constitutional protections of surpassing importance." Apprendi, 530 U.S. at 476, 120 S.Ct. 2348. Moreover, the Court asserted that any statutory scheme that violates Apprendi represents "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." Id. at 497, 120 S.Ct. 2348. In other words, the Supreme Court's opinion makes clear that we are dealing with values fundamental to the American constitutional scheme for criminal justice. This assessment and these values were recently reaffirmed in Blakely.
In its appraisal, and contrary to the United States Supreme Court's appraisal, the majority "fundamentally" misperceives the values this country was founded upon and ignores hundreds of years of our unique legal traditions. In discussing the decision as one only involving procedural rights, the majority clearly misses the point that we have adopted a procedural system of justice in this country (often referred to as an adversarial system), that relies upon procedural safeguards to ensure just results. The majority opinion in Blakely explains:
Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As Apprendi held, every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment. Under the dissenters' alternative, he has no such right. That should be the end of the matter.
124 S.Ct. at 2543. In other words, unlike the civil jurisdictions in Europe and elsewhere, our guarantee of justice rests *865 virtually entirely upon the procedural safeguards we have put in place. The guarantee of these safeguards and due process provides the foundation for the rule of law in this country and its placement in our constitution was virtually demanded by our citizens in the very first session of the U.S. Congress. The right to trial by jury is perhaps the most important ingredient in that foundation and the opinions in Apprendi and Blakely make that clear.
Notably, the United States Supreme Court has declared even before Apprendi and Blakely:
The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence  that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law."
In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).[28]Apprendi and Blakely add strength to this assessment. However, contrary to this declaration, the majority's discussion trivializes the fundamental difference between the use of this standard in a trial by a professional judge and a trial by a jury of a citizen's peers. It also fails to consider the significance of the criminal burden of proof enforced by a jury sworn under oath, and the real possibility that the oath-bound citizen jurors may conclude that the State with all its power has not carried its burden of proof against a fellow citizen beyond a reasonable doubt. Have we here in Florida reached the point where we are in open disagreement with our Founding Fathers on the fundamental importance of the right to a trial by jury in our American society?
I also agree with Chief Justice Pariente's analysis, and disagree with the majority's implication that a finding of facts by the preponderance of the evidence by a professional judge is the equivalent of a jury finding facts beyond a reasonable doubt. Blakely makes this clear in noting that this characterization would fit much better in legal systems we have long ago rejected as alien to our vision of justice. Indeed, it demeans the unique chemistry inherent in the constitutional guarantee of a right to trial by jury provided by our founding fathers in the first amendments to our constitution. That right includes the requirement that a jury composed of a citizen's peers apply the reasonable doubt standard.

Extent of Reliance on Old Rule
The second factor under the Stovall/Linkletter test requires that the Court examine the extent of reliance on the old rule. Witt, 387 So.2d at 926.
First, and most importantly, this discussion ignores the fact that reliance on the practice of judicial fact-finding has already been sharply limited by this Court's own long-standing decisions limiting a judge's authority to determine facts which might have a significant impact on a criminal sentence. To its credit, this Court long ago gave notice of the same concerns subsequently addressed by the United States Supreme Court in Apprendi and Blakely. *866 In other words, well before Apprendi, we have required explicit jury findings on such issues as possession of a firearm, the quantity of drugs, and other factors that might authorize a greater punishment for the underlying crime. See, e.g., State v. Estevez, 753 So.2d 1, 7 (Fla.1999) (holding that before relevant mandatory minimum sentence can be imposed under cocaine trafficking statute, jury must expressly determine amount of cocaine involved, even in cases where evidence is uncontroverted); State v. Overfelt, 457 So.2d 1385, 1387 (Fla.1984) (stating that "[t]he question of whether an accused actually possessed a firearm while committing a felony is a factual matter properly decided by the jury").[29] Hence, longstanding Florida law is not only consistent with the holding of Apprendi, but precedes it and our holding today. Outlawing the substantial enhancement of sentences above the statutory maximums based upon judicial fact-finding is not only consistent with Apprendi, but consistent with our prior case law. Apprendi and Blakely are consistent with our own precedent, not disruptive of it.
Further, it is important to note that the rule in question today is limited to a situation that has allowed judges to find facts that would increase a sentence above the maximum set out in the Florida statute for the particular crime. Hence, we are only dealing with exceptional circumstances. Imposing a sentence above the statutory maximum is clearly an exception to the ordinary practice where a sentence is imposed within the statutory range. Hence, a retroactive application of Apprendi would not affect cases where the judge assigned victim injury points, but still sentenced the defendant at or below the statutory maximum. As the majority notes, this type of judicial fact-finding is still permissible, because it does not involve the judge exceeding the sentence allowed by the jury verdict alone. See Harris v. United States, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002).[30] A verdict of guilty authorizes a judge to impose a sentence up to the statutory maximum. Hence, only in those cases where a defendant's right to a jury trial was violated by a judge's determination of an additional issue, resulting in a sentence in excess of the statutory maximum, will retroactivity be implicated.
Further, while the majority states that trial courts have long practiced this type of fact-finding, the statutory guidelines in question in this case that allowed the judge to exceed the statutory maximum only existed from 1994 until 1998. See § 921.001(5), Fla. Stat. (1993) (requiring sentences imposed under the revised 1994 sentencing guidelines sentences to be imposed even when the guidelines sentence exceeded the statutory maximum). Of *867 course, regardless of the effect of Apprendi, any judge fact-finding would have been subject to our pre-Apprendi case law in Overfelt, Estevez, and similar cases.[31]
Although section 921.001(5) was repealed with the passage of the Criminal Punishment Code, see ch. 97-194, § 1, Laws of Fla., the code also gave trial courts the power to find facts resulting in sentences that could exceed the statutory maximum. See § 921.0024(2), Fla. Stat. (Supp.1998) (requiring sentence calculated under the code to be imposed, even where it was above statutory maximum). However, since Apprendi was decided in 2000, this statutory rule could only have been relied on for a maximum of six years.
Importantly, under our Witt retroactivity analysis, we have already determined that six years is minimal for purposes of determining the extent of reliance on the old rule. See State v. Stevens, 714 So.2d 347, 350 (Fla.1998) (Harding, J., concurring) (stating that reliance on old rule was minimal when the statute had been in force for "a period of only a little more than six years"); State v. Callaway, 658 So.2d 983, 987 (Fla.1995) (stating the administration of justice would be detrimentally affected if criminal defendants sentenced during a six-year window were required to serve sentences two or more times as long as similarly situated defendants who happened to be sentenced after the decision that retroactively applied), receded from on other grounds by Dixon v. State, 730 So.2d 265 (Fla.1999). Hence, in fact, the "old rule" in question has been relied upon only (1) when the calculated sentence based on a judge's fact-finding exceeded the statutory maximum, and (2) then only at most during the six years that this sentencing scheme operated before Apprendi was decided.

Effect of Retroactive Application on the Administration of Justice
Under the third prong of the Stovall/Linkletter test, we must consider the *868 effect that retroactivity would have on the administration of justice in Florida. As noted above, the application of Apprendi is consistent with and not disruptive of our own case law on the same issue. See supra note 31, and accompanying text.
Again, I disagree with the majority opinion's conclusion that there would be a profound and unsettling effect on the administration of justice, as this determination is unsupported by any factual evidence in the record and is contrary to other cases where we have determined there was a profound impact. See, e.g., State v. Stevens, 714 So.2d 347, 350 (Fla.1998) (Harding, J., concurring) (explaining that State v. Gray, 654 So.2d 552 (Fla.1995), was the type of case that should not be given retroactive effect because "[r]etroactive application would require hundreds of new trials, which would require expensive and timely preparation for old cases and necessitate the relocating of witnesses and evidence  in some cases for crimes that occurred a decade before"). Apprendi and Blakely primarily focus on sentencing and judicial fact-finding that has been used to increase sentences. Obviously, the defendant's underlying conviction is not at issue here since we are dealing only with a claim of an unlawful sentence imposed above the statutory maximum and without a jury.
The majority quotes language from the Fifth District's decision on remand from the Supreme Court in McCloud v. State, 803 So.2d 821, 827 (Fla. 5th DCA 2001), indicating that the effect would be "colossal" if every sentence including judicially determined victim injury components were invalidated. However, the court's concern in McCloud clearly dealt with the impact of what would happen if every sentence where victim injury points were assigned by the judge were invalidated, not just cases where the defendant's sentence exceeded the statutory maximum. As noted by the majority, Apprendi would have no effect on cases where a defendant's sentence did not exceed the maximum sentence under the statute. See Harris v. United States, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002).
In determining the effect on the administration of justice in sentencing under the now repealed section 921.005(5), the Court should look at such factors as the potential number of individuals who might be entitled to relief, the ease with which those individuals can be identified from those who would file but would not be entitled to relief, and in the cases where relief was warranted, what such relief would entail. Each of these considerations weighs in favor of retroactivity in the situation at hand.
First, before any postconviction claimant would be entitled to any collateral relief, there would have to be a determination (1) that victim injury sentencing points, other than those associated with prior convictions, were assigned based solely on a judge's findings;[32] (2) that these sentencing points caused the sentence imposed to exceed the statutory maximum allowed by the jury's conviction alone;[33] and (3) that the error was not harmless beyond a reasonable doubt because the defendant stipulated to the enhanced circumstances or sentence or the jury clearly would have made the same finding as the judge. It is apparent that the great bulk of collateral claims could not overcome these hurdles.
For example, initially, the State would have to make the determination as to whether a sentence within the statutory *869 maximum would be adequate, or whether it would demand the enhanced punishment that requires an additional jury proceeding. This review itself would eliminate a substantial number of cases. Further, in many cases, these claims could be resolved simply by looking at the sentencing documents. For example, if the collateral litigant's sentence did not exceed the statutory maximum, no relief would be available.
In those cases where the Apprendi violation was harmful, the defendant could be resentenced within the range allowed by the jury's verdict. Only in the extraordinary case would an additional jury trial be necessary to establish the facts necessary to impose the enhanced sentence. The majority wholly fails to cite any empirical data to the contrary. Accordingly, I do not agree that the impact of a holding of retroactivity on the administration of justice will be as profound as alleged by the majority.
The majority has also overlooked the fact that retroactivity does not necessarily mean that no conditions may be placed on the retroactive application of an important decision. See James v. State, 615 So.2d 668, 669 (Fla.1993) (holding that retroactive application of the United States Supreme Court's ruling in Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), that Florida's heinous, atrocious and cruel (HAC) jury instruction was unconstitutional, was to be retroactively applied where appellant "objected to the then-standard instruction at trial, asked for an expanded instruction, and argued on appeal against the constitutionality of the instruction his jury received").

CONCLUSION
We must remember that the key question under Witt is whether Apprendi constitutes a decision of "fundamental significance." Despite the United States Supreme Court's characterization of its decision in Apprendi as one requiring "constitutional protections of surpassing importance," and its recent reaffirmation of Apprendi's importance in Blakely, the majority has found the decision not one of fundamental significance. In its fixation on finality, the majority has written off the Apprendi decision as one of minor procedural error. The United States Supreme Court's own characterization of the significance of Apprendi directly refutes this conclusion.
Ultimately, however, the overriding interests of fairness and uniformity make it impossible to justify a decision that deprives individuals of their life or liberty based on a fact-finding process that has been determined to be violative of fundamental constitutional rights. See Witt, 387 So.2d at 925. Our admonition in Witt bears repeating here:
The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications. Thus, society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of postconviction relief is necessary to avoid individual instances of obvious injustice. Considerations of fairness and uniformity make it very "difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases."

Witt, 387 So.2d at 925 (emphasis added). These words fit precisely the situation we face today in determining whether to permit persons to go to their deaths or be imprisoned for life in open violation of their fundamental and constitutional right to trial by jury. As I have written in *870 Johnson, justice has not been served today.
NOTES
[1] The precise question was:

DOES THE RULING ANNOUNCED IN APPRENDI v. NEW JERSEY, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), APPLY RETROACTIVELY?
826 So.2d at 1074.
[2] Section 921.001(5), Florida Statutes (1997), provides in relevant part that "[i]f a recommended sentence under the guidelines exceeds the maximum sentence otherwise authorized by s. 775.082, the sentence under the guidelines must be imposed, absent a departure." The identical sentence appears in section 921.0014(2), Florida Statutes (1997).
[3] Figarola also certified the question of whether Apprendi is retroactive. See 841 So.2d at 577.
[4] The references are to Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).
[5] Notwithstanding the fundamental nature of the right to a jury trial, the Court in Summerlin concluded that "it does not follow that, when a criminal defendant has had a full trial and one round of appeals in which the State faithfully applied the Constitution as we understood it at the time, he may nevertheless continue to litigate his claims indefinitely in hope that we will one day have a change of heart." 124 S.Ct. at 2526.
[6] As Justice Anstead notes in his dissent, "the underlying conviction is not at issue here." See dissenting op. at 868.
[7] We already require a jury finding of firearm possession where the trial court imposes the mandatory minimum sentence for use of a firearm. State v. Overfelt, 457 So.2d 1385, 1387 (Fla.1984). Courts have not required a jury finding, however, to assess points for firearm possession during felonies not enumerated in the statute. Crossley v. State, 741 So.2d 1208, 1211 (Fla. 5th DCA 1999); Bradford v. State, 722 So.2d 858, 860 (Fla. 1st DCA 1998); see Fla. R.Crim. P. 3.703(d); White v. State, 714 So.2d 440, 442-44 (Fla. 1998).
[8] See Sepulveda v. United States, 330 F.3d 55, 60 (1st Cir.2003); Coleman v. United States, 329 F.3d 77, 90 (2d Cir.), cert. denied, 540 U.S. 1061, 124 S.Ct. 840, 157 L.Ed.2d 719 (2003); United States v. Swinton, 333 F.3d 481, 491 (3d Cir.), cert. denied, 540 U.S. 977, 124 S.Ct. 458, 157 L.Ed.2d 330 (2003); United States v. Brown, 305 F.3d 304, 309 (5th Cir.2002), cert. denied, 538 U.S. 1007, 123 S.Ct. 1919, 155 L.Ed.2d 840 (2003); Goode v. United States, 305 F.3d 378, 382-85 (6th Cir.), cert. denied, 537 U.S. 1096, 123 S.Ct. 711, 154 L.Ed.2d 647 (2002); Curtis v. United States, 294 F.3d 841, 843-44 (7th Cir.), cert. denied, 537 U.S. 976, 123 S.Ct. 451, 154 L.Ed.2d 334 (2002); United States v. Mora, 293 F.3d 1213, 1218-19 (10th Cir.), cert. denied, 537 U.S. 961, 123 S.Ct. 388, 154 L.Ed.2d 315 (2002); United States v. Sanchez-Cervantes, 282 F.3d 664, 671 (9th Cir.), cert. denied, 537 U.S. 939, 123 S.Ct. 48, 154 L.Ed.2d 243 (2002); United States v. Sanders, 247 F.3d 139, 146 (4th Cir.), cert. denied, 534 U.S. 1032, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001); McCoy v. United States, 266 F.3d 1245, 1258 (11th Cir.2001), cert. denied, 536 U.S. 906, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002); United States v. Moss, 252 F.3d 993, 998 (8th Cir.2001), cert. denied, 534 U.S. 1097, 122 S.Ct. 848, 151 L.Ed.2d 725 (2002). Federal courts use the retroactivity analysis of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), under which a new rule is not retroactive unless it (1) places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority," or (2) "requires the observance of `those procedures that ... are implicit in the concept of ordered liberty'" and "implicate[s] the fundamental fairness of the trial." Id. at 307, 311-312, 109 S.Ct. 1060 (quoting Mackey v. United States, 401 U.S. 667, 692, 693, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)). To qualify under the latter exception, the rule must "`alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular proceeding.'" Id. at 311, 109 S.Ct. 1060 (quoting Mackey, 401 U.S. at 693, 91 S.Ct. 1171). This exception applies only to "watershed" rules of procedure "central to an accurate determination of innocence or guilt." Id. at 311, 313.
[9] See, e.g., Sanders v. State, 815 So.2d 590, 592 (Ala.Crim.App.), cert. denied, 534 U.S. 956, 122 S.Ct. 358, 151 L.Ed.2d 271 (2001); State v. Sepulveda, 201 Ariz. 158, 32 P.3d 1085, 1088 (Ct.App.2001); People v. Bradbury, 68 P.3d 494, 499 (Colo.Ct.App.2002), cert. denied, No. 02SC850, 2003 WL 1958429 (Col. Apr. 28, 2003); People v. De La Paz, 204 Ill.2d 426, 274 Ill.Dec. 397, 791 N.E.2d 489, 497 (2003), cert. denied, 540 U.S. 922, 124 S.Ct. 320, 157 L.Ed.2d 221 (2003); Whisler v. State, 272 Kan. 864, 36 P.3d 290, 300 (2001), cert. denied, 535 U.S. 1066, 122 S.Ct. 1936, 152 L.Ed.2d 841 (2002); Meemken v. State, 662 N.W.2d 146, 150 (Minn.Ct.App.2003); State ex rel. Nixon v. Sprick, 59 S.W.3d 515, 520 (Mo.2001); State v. Tallard, 149 N.H. 183, 816 A.2d 977, 981 (2003); Page v. Palmateer, 336 Or. 379, 84 P.3d 133, 134, cert. denied, ___ U.S. ___, 125 S.Ct. 205, 160 L.Ed.2d 110 (2004); Greenup v. State, No. W2001-01764-CCA-R3PC, 2002 WL 31246136 (Tenn.Crim.App. Oct.2, 2002); see also State v. Lotter, 266 Neb. 245, 664 N.W.2d 892, 907 (2003) (noting that "clear majority of state and federal jurisdictions hold that Apprendi may not be applied retroactively to final judgments on collateral review"), cert. denied, ___ U.S. ___, 124 S.Ct. 2904, 159 L.Ed.2d 815 (2004). These courts also applied the Teague analysis.
[10] In a separate opinion, this Court holds, employing a Witt analysis, that Ring does not apply retroactively. Johnson v. State, No. SC03-1042, 904 So.2d 400, 405, 2005 WL 977017 (Fla. Apr. 28, 2005); see also Monlyn v. State, 894 So.2d 832, 839-40 (Fla.2004) (Cantero, J., concurring); id. at 841 (Pariente, C.J., specially concurring). Other state courts also have held that Ring does not apply retroactively. State v. Towery, 204 Ariz. 386, 64 P.3d 828, 836, cert. dismissed, 539 U.S. 986, 124 S.Ct. 44, 156 L.Ed.2d 702 (2003); Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 619 (2003); Porter v. State, 140 Idaho 780, 102 P.3d 1099 (2004); State v. Lotter, 266 Neb. 245, 664 N.W.2d 892, 908 (2003); Colwell v. State, 118 Nev. 807, 59 P.3d 463, 471 (2002), cert. denied, 540 U.S. 981, 124 S.Ct. 462, 157 L.Ed.2d 370 (2003); Moeller v. Weber, 689 N.W.2d 1 (S.D.2004); Ex parte Briseno, 135 S.W.3d 1, 9-10 (Tex.Crim.App.2004) ("[W]e join those courts that have held that the Supreme Court's decision in Ring ... is not retroactively applicable to cases on post-conviction habeas corpus review.").
[11] Justice Anstead is correct to state that this Court "has never adopted" Teague. Dissenting op. at 861. In fact, Florida courts have never considered whether to adopt it. See Windom v. State, 886 So.2d 915, 944 (Fla. 2004) (Cantero, J., specially concurring). Nor need we do so now, as we have concluded that even under the Witt standard, Apprendi is not retroactive.
[12] Florida Rule of Criminal Procedure 3.850, which governs postconviction relief, was promulgated to provide "a method of reviewing a conviction based on a major change of law, where unfairness was so fundamental in either process or substance that the doctrine of finality had to be set aside." Witt, 387 So.2d at 927.
[13] Cf. Apprendi, 530 U.S. at 538, 120 S.Ct. 2348 (O'Connor, J., dissenting) (terming the majority's reasoning in Apprendi "baffling, to say the least").
[14] Witt v. State, 387 So.2d 922 (Fla.1980).
[15] See id. at 926 (holding that the retroactivity of a new rule of law may be determined by assessing (a) the purpose served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of retroactive application of the new rule).
[16] DeStefano, 392 U.S. at 633, 88 S.Ct. 2093 (explaining that the "purpose" served by a new rule of law is one of three factors for determining retroactivity under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and then holding that "[a]ll three factors favor only prospective application" of the jury-trial guarantee to the states).
[17] One indicator of the number of challenges that can be anticipated from retroactive application of Apprendi's limitation of Mays is the fact that Hughes' case is one of what appears to be only four pending in this Court involving guidelines sentences that exceed the statutory maximum. See Brown v. State, 829 So.2d 286 (Fla. 3d DCA 2002) (per curiam affirmance without opinion citing Hughes), notice invoking discretionary jurisdiction filed, No. SC02-2711 (Fla. Nov. 25, 2002); Leonard v. State, 892 So.2d 1235 (Fla. 3d DCA 2005), notice invoking discretionary jurisdiction filed, No. SC05-573 (Fla. Apr. 1, 2005) (denial of rehearing citing Hughes); Figarola v. State, 841 So.2d 576 (Fla. 4th DCA 2003) (certifying same question as in Hughes in case involving sentence exceeding statutory maximum based on judge's finding of victim injury), notice invoking discretionary review filed, No. SC03-586 (Fla. Apr. 7, 2003). The issue also has arisen in several district court decisions not now before us for review. See Padilla v. State, 888 So.2d 131 (Fla. 4th DCA 2004) (certifying same question as in Hughes under same circumstances); Enoch v. State, 873 So.2d 443 (Fla. 5th DCA 2004) (per curiam affirmance without opinion citing Figarola).
[18] I disagree with the majority's reliance on our statement in McGregor v. State, 789 So.2d 976, 977 (Fla.2001), that an Apprendi claim was unpreserved and does not constitute fundamental error to support its holding that Apprendi is not retroactive. The issue in McGregor was whether, in light of Apprendi, the defendant's release must be proved to a jury beyond a reasonable doubt in order for the defendant to be subject to the penalties of the Prison Releasee Reoffender Act. Because a Prison Releasee Reoffender sentence does not exceed the statutory maximum, we held that the sentence did not violate Apprendi. See id. at 978. Subsequent to McGregor, the United States Supreme Court also held that judicial fact-finding that increases a mandatory minimum sentence but does not result in a sentence exceeding the statutory maximum is not in violation of Apprendi. See Harris v. United States, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002). Thus, because we reached the merits, any statement about lack of preservation in McGregor was dicta. In addition, reliance on footnote 2 of McGregor, 789 So.2d at 978 n. 2, is misplaced because it is not even clear what type of Apprendi violation the Court was referring to. In this case, in contrast to McGregor, the Apprendi error is the failure to require proof beyond a reasonable doubt of a fact resulting in a sentence in excess of the statutory maximum. Thus, the failure to apply the standard of proof beyond a reasonable doubt in assessing victim injury is a critical fact in determining whether or not the sentence imposed on Hughes was illegal.
[19] I agree with Chief Justice Pariente's conclusion that the reasonable doubt standard mandated by Apprendi must be retroactively applied under Witt.
[20] The United States Supreme Court has recently decided in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), that Ring v. Arizona should not be retroactively applied in the federal courts. Ring, of course, applies Apprendi in the death penalty context.

Initially, I would note the obvious: Schriro was applying Teague and therefore does not control the question of retroactivity in Florida. In fact, Schriro is a textbook example for why the states should be wary of embracing Teague. Its application with regard to Ring has yielded a result that is fundamentally unfair, internally inconsistent, and unreasonably harsh. The Supreme Court notes that "[t]he right to jury trial is fundamental to our system of criminal procedure," Schriro, 124 S.Ct. at 2526, yet arbitrarily concludes that this fundamental right should not be enjoyed by those facing executions and unfortunate enough to fall on the wrong side of Ring's release date. As I have noted in this opinion, "[i]f anything, the more restrictive standards of federal review place increased and heightened importance upon the quality and reliability of the state proceedings." Infra p. 863. Applying Apprendi and Ring retroactively is favored by "the legal system's commitment to `equal justice'  i.e., to `assur[ing] a uniformity of ultimate treatment among prisoners.'" Schriro, 124 S.Ct. at 2528-29 (Breyer, J., dissenting) (quoting Mackey v. United States, 401 U.S. 667, 689, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971)). Thus, while unfortunate, the decision in Schriro only reaffirms the importance of Florida's independent consideration of retroactivity under Witt.
[21] See, e.g., State v. Klayman, 835 So.2d 248, 254 (Fla.2002) (holding that decision in Hayes v. State, 750 So.2d 1 (Fla.1999), which held that section 893.135(1)(c)(1), Florida Statutes (Supp.1996), was only intended to apply to Schedule I and II drugs, warranted retroactive application); Ferguson v. State, 789 So.2d 306, 309-12 (Fla.2001) (holding that decision in Carter v. State, 706 So.2d 873, 875 (Fla. 1997), which held that a competency hearing is required in postconviction proceedings "when there are reasonable grounds to believe that a capital defendant is incompetent to proceed in postconviction proceedings in which factual matters are at issue, the development or resolution of which require the defendant's input," should be applied retroactively); Mitchell v. Moore, 786 So.2d 521, 529-31 (Fla.2001) (holding copy requirement of Florida's Prisoner Indigency Statute unconstitutional as a violation of a prisoner's right to access the courts, and applying Witt test to determine that new rule announced in case should be applied retroactively); State v. Stevens, 714 So.2d 347, 348 (Fla.1998) (holding that decision in State v. Iacovone, 660 So.2d 1371, 1374 (Fla.1995), which held that sections 784.07(3) and 775.0825, Florida Statutes (1991), only applied to attempted first-degree murder, should apply retroactively); State v. Gantorius, 708 So.2d 276, 277 (Fla.1998) (acknowledged decision in State v. Stevens, and held that decision in State v. Iacovone, 660 So.2d 1371 (Fla.1995), which held that mandatory minimum sentencing laws with respect to second and third-degree attempted murder were invalid, was to be applied retroactively); State v. Callaway, 658 So.2d 983, 985 (Fla.1995) (holding that decision in Hale v. State, 630 So.2d 521, 526 (Fla.1993), which held that trial courts could not impose consecutive habitual felony offender sentences for multiple offenses arising out of the same criminal episode, should apply retroactively), receded from on other grounds by Dixon v. State, 730 So.2d 265 (Fla.1999); James v. State, 615 So.2d 668, 669 (Fla.1993) (holding that the United States Supreme Court's decision in Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), which held that Florida's heinous, atrocious, or cruel aggravating circumstance instruction was unconstitutional, should be retroactively applied where James' counsel objected to the instruction at trial); Moreland v. State, 582 So.2d 618, 620 (Fla. 1991) (holding that decision in Spencer v. State, 545 So.2d 1352, 1355 (Fla.1989), which held that administrative order that divided Palm Beach County into eastern and western jury districts resulted in the unconstitutional systematic exclusion of blacks from the eastern district's jury pool, should be applied retroactively); Jackson v. Dugger, 547 So.2d 1197, 1198 (Fla.1989) (holding that decision in Booth v. Maryland, 482 U.S. 496, 502-03, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which held that victim impact evidence is inadmissible in a capital sentencing proceeding, overruled by Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), applied retroactively); Bass v. State, 530 So.2d 282, 283 (Fla.1988) (holding that ruling in Palmer v. State, 438 So.2d 1 (Fla.1983), which held that the three-year minimum mandatory sentences described by Florida Statutes could not be imposed consecutively for separate offenses arising from a single criminal transaction or episode, was to be applied retroactively); Thompson v. Dugger, 515 So.2d 173, 175 (Fla.1987) (concluding that Hitchcock v. Dugger, 481 U.S. 393, 398-99, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), which held that instruction to advisory jury to not consider nonstatutory mitigation and trial judge's refusal to consider nonstatutory mitigation were improper, should be applied collaterally); Harvard v. State, 486 So.2d 537, 539 (Fla.1986) (holding that the United States Supreme Court's decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which held that the exclusion of nonstatutory mitigating evidence was unconstitutional, warranted retroactive application); State v. White, 470 So.2d 1377, 1379 (Fla.1985) (concluding that Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which held that the "imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed," is improper, should be applied collaterally); Tafero v. State, 459 So.2d 1034, 1035 (Fla.1984) (determining, under Witt, that Enmund is "such a change in the law as to be cognizable in postconviction proceedings"). See e.g., the following cases decided before this Court's decision in Witt, in which this Court also applied a rule of law retroactively: Benyard v. Wainwright, 322 So.2d 473, 475 (Fla.1975) (holding that decision in Brumit v. Wainwright, 290 So.2d 39 (Fla. 1974), which held that the Parole Commission may not delay the effective date of a parole revocation until the new sentence for the offense causing the revocation is completed, warranted retroactive application); State v. Statewright, 300 So.2d 674, 677 (Fla.1974) (acknowledging a limited retroactivity of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where defendant's interrogation occurred before Miranda, but the trial occurred afterwards); Ray v. State, 200 So.2d 529, 530 (Fla.1967) (stating that: "It becomes clear, therefore, under the retroactive application of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), that Ray is entitled to a new trial.").
[22] As the majority concedes, this Court has long utilized the Witt test for determining when important changes in decisional law should be applied retroactively. See State v. Glenn, 558 So.2d 4, 6 (Fla.1990); McCuiston v. State, 534 So.2d 1144, 1146 (Fla.1988). As noted above, however, while we have applied numerous important decisions retroactively under this analysis, the majority has chosen to ignore those decisions; it does not make even the slightest attempt to distinguish the significance of the issue involved in those cases from the important issue involved herein: the fundamental and constitutional right to a trial by jury. See supra note 21.
[23] Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).
[24] In fact, the majority relies on an out-of-context quote from Ring to bolster its analysis. The quote states: "The Sixth Amendment jury trial right ... does not turn on the relative rationality, fairness, or efficiency of potential factfinders." Ring, 536 U.S. at 607, 122 S.Ct. 2428. This quote from Ring is taken entirely out of context, and does not support the assertion made by the majority. In fact, the Court was rejecting Arizona's argument that judicial fact-finding would lead to less arbitrary results than jury fact-finding. A more complete quote from Ring demonstrates the Court's meaning:

Arizona suggests that judicial authority over the finding of aggravating factors "may ... be a better way to guarantee against the arbitrary imposition of the death penalty." Tr. of Oral Arg. 32. The Sixth Amendment jury trial right, however, does not turn on the relative rationality, fairness, or efficiency of potential factfinders. Entrusting to a judge the finding of facts necessary to support a death sentence might be
"an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State.... The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free." Apprendi, 530 U.S., at 498, 120 S.Ct. 2348 (SCALIA, J., concurring).
Ring, 536 U.S. at 607, 122 S.Ct. 2428.
[25] The majority's cite to Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), is puzzling because it held "that the right to jury trial in serious criminal cases is a fundamental right and hence must be recognized by the States as part of their obligation to extend due process of law to all persons within their jurisdiction." Id. at 154, 88 S.Ct. 1444. Despite the fact that Duncan was concerned with the importance of the Sixth Amendment guarantee, the majority focuses on two narrow comments made in the opinion about how a defendant could be fairly treated by a judge, rather than jury. However, put into context, it is clear that the Court was only rejecting the idea that a jury trial was compulsory, i.e., that the defendant had no choice in the matter. The Court was explaining, "[W]e hold no constitutional doubts about the practices, common in both federal and state courts, of accepting waivers of jury trial and prosecuting petty crimes without extending a right to jury trial." Id. at 158, 88 S.Ct. 1444 (footnote omitted). In the instant case, this was not a petty crime with a short jail sentence. Moreover, as the Court explained in Blakely citing to Duncan, the fact that a defendant can choose to waive Apprendi rights does not mean that they can be withheld:

[N]othing prevents a defendant from waiving his Apprendi rights. When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding. See Apprendi, 530 U.S., at 488, 120 S.Ct. 2348; Duncan v. Louisiana, 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)....
....
... [T]he Sixth Amendment was not written for the benefit of those who choose to forgo its protection. It guarantees the right to jury trial. It does not guarantee that a particular number of jury trials will actually take place. That more defendants elect to waive that right (because, for example, government at the moment is not particularly oppressive) does not prove that a constitutional provision guaranteeing availability of that option is disserved.
Blakely, 124 S.Ct. at 2542.
Second, the majority notes that the Court rejected the retroactive application of Duncan in DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) based on the Stovall/Linkletter standard and uses this conclusion to support the notion that the right to trial by jury is not important enough to warrant retroactive application. However, to use DeStefano to support a holding of nonretroactivity in the instant case requires one to ignore what the opinion actually says. In fact, when one examines the application of Stovall/Linkletter in DeStefano, it supports retroactivity here under our Witt analysis. The Court concluded that all three prongs of the Stovall/Linkletter test favored prospective application of Duncan. However, it is clear that the Court's primary focus was on the second two prongs, i.e. "the extent of the reliance by law enforcement authorities on the old standards" and "the effect on the administration of justice of a retroactive application of the new standards." DeStefano, 392 U.S. at 633, 88 S.Ct. 2093. As to the second prong, the Court noted that the states had no doubt relied on earlier decisions of the Court "to the effect that the Sixth Amendment right to jury trial was not applicable to the States." Id. at 634, 88 S.Ct. 2093. As an example, the Court cited a case that was over sixty years old at the time DeStefano was decided. Id. (citing Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 44 L.Ed. 597 (1900)). Therefore, the fact that the states had relied on decisions from the Court opposite from the decision in Duncan for no fewer than sixty years obviously played a part in the Court's decision. As for the third prong, the Court stated:
[T]he effect of a holding of general retroactivity on law enforcement and the administration of justice would be significant, because the denial of jury trial has occurred in a very great number of cases in those States not until now accepting the Sixth Amendment guarantee. For example, in Louisiana all those convicted of noncapital serious crimes could make a Sixth Amendment argument. And, depending on the Court's decisions about unanimous and 12-man juries, all convictions for serious crimes in certain other States would be in jeopardy.
Id. at 634, 88 S.Ct. 2093. Thus, the Court was concerned with the fact that there would be innumerable jury trials on guilt or innocence necessary across the country if Duncan was retroactively applied. See Schriro v. Summerlin, 542 U.S. 348, ___-___, 124 S.Ct. 2519, 2530-31, 159 L.Ed.2d 442 (2004) (Breyer, J., dissenting) (noting that the second two prongs of Stovall/Linkletter "argued strongly against retroactivity" in DeStefano and that "the DeStefano Court would have come out differently had it been considering Ring's rule"). The majority's reliance on DeStefano is only a further reflection of its reliance on inapplicable cases and the weaknesses of its Witt analysis.
Indeed, the conclusion in this case under Witt and the Stovall/Linkletter second and third prongs is entirely different than it would be for DeStefano. Here, the prior rule was only relied on in those limited instances when the sentence exceeded the statutory maximum and then only for a period of six years. Moreover, there would not need to be a number of new trials in the instant case.
[26] See supra note 21.
[27] The majority cites to a statement from Apprendi where the Court noted that New Jersey's substantive basis for enhancement of a sentence was not at issue. See Apprendi, 530 U.S. at 475, 120 S.Ct. 2348 ("The substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's procedure is.") The majority interprets this statement to mean that Apprendi dealt only with procedure. However, as the Supreme Court's recent decision in Blakely makes clear, and as Judge Barkett explained in her opinion in McCoy v. United States, 266 F.3d 1245 (11th Cir.2001), interpreting this language to mean that the change in law announced in Apprendi was only procedural, and not even partially substantive, "misses the mark entirely." Id. at 1272 (Barkett, J., dissenting). When the language regarding substance versus procedure from Apprendi is viewed in its proper context, it is clear that the Supreme Court was referring to the fact that the constitutionality of the "substantive basis" of the penalty enhancement  in the case of Apprendi, racial bias  was not before the Court. Id. In the instant case, the substantive basis for enhancement, namely, the extent of the victim's injuries, is also not before this Court. Nevertheless, the fact that the substantive basis for enhancement is not at issue has "no bearing whatsoever on whether Apprendi creates a change in substantive law." Id.
[28] Therefore, the majority's statement that Apprendi does not affect the determination of guilt or innocence is not accurate. See majority op. at 841. As Justice Scalia explained in Apprendi, where the existence of an additional fact would allow a sentence that exceeds the statutory maximum, this fact would be an element of an enhanced crime. Hence, it would need to be found by the jury beyond a reasonable doubt before the defendant could be sentenced for, or be found guilty of, the enhanced crime.
[29] The majority asserts that retroactive application of Apprendi will require juries to be empanelled to decide issues such as whether the defendant possessed a firearm during the commission of a crime. Of course, under our established law, and regardless of Apprendi, this type of fact must be decided by the jury. Moreover, the majority's claim that a jury will need to be empanelled to determine the issue causing the sentence enhancement would apply only to a limited number of cases. In most instances, the cause for the sentence enhancement would be clear from the sentencing scoresheet and most questions regarding whether Apprendi error had occurred could be answered simply by reviewing the scoresheet and other sentencing documents. The majority is focusing only on those cases where relief is granted and the State insists upon a punishment greater than the statutory maximum and the defendant insists upon upholding his right to a jury trial.
[30] The instant case may be an anomaly, because the defendant was only found guilty of a third-degree felony allowing for a five-year maximum sentence. In other cases with severe injuries, the conviction would be more likely to be a higher degree felony with an increased maximum sentence.
[31] In this regard, the majority leaves as unstated a key point: namely, the operation of the statutory scheme in the instant case violates the constitution under circumstances where a judge finds facts related to a victim's injury and that causes the sentence to exceed the statutory maximum allowed. The United States Supreme Court has already mandated that the very statutory scheme at issue in the instant case must be re-examined under Apprendi. See McCloud v. State, 741 So.2d 512, 515 (Fla. 5th DCA 1999) (which held that section 921.0024, Florida Statutes (1997), was constitutional because the judge's scoring of victim injury points constituted mere sentencing factors, not elements of the offense) vacated, 531 U.S. 1063, 121 S.Ct. 751, 148 L.Ed.2d 654 (2001). The Fifth District held in McCloud that victim injury was a sentencing factor that "plainly does not need to be charged, nor must it be decided by a jury, nor must it be decided beyond a reasonable doubt." Id. at 514. Upon review by the United States Supreme Court, McCloud was vacated and remanded for reconsideration in light of Apprendi. See McCloud v. Florida, 531 U.S. 1063, 121 S.Ct. 751, 148 L.Ed.2d 654 (2001). More recently, the United States Supreme Court has explicitly outlawed such judicial fact-finding in sentencing guideline cases in Blakely.

Part of the problem with the instant case is that the limited record prevents us from knowing the specific facts of the case. Nevertheless, the maximum sentence for conviction for the crime Hughes was convicted of, a third-degree felony of battery by a detainee, is five years in prison, § 775.082(3)(d), Fla. Stat. (1997). However, if Hughes was indeed convicted only of simple "battery" by a detainee described in section 784.082(3), Florida Statutes (1997), but there were severe victim injuries, it raises the question of why he was not convicted of the more serious first-degree felony of "aggravated battery" by a detainee described in section 784.082(1). The difference between the two crimes, in part, can be based on the degree of victim injury. See § 784.045(1)(a)1., Fla. Stat. (1997) (defining aggravated battery in pertinent part as "[i]ntentionally or knowingly caus[ing] great bodily harm, permanent disability, or permanent disfigurement").
[32] Hence, where there was an indication that the jury actually found the facts associated with the victim's injury such as by finding guilt of an injury related crime, no relief would be available. See, e.g., State v. Overfelt, 457 So.2d 1385 (Fla.1984).
[33] Id.